THE PEOPLE ex rel. AUGUSTUS BOCKES, Appellant, *v.* EDWARD WEMPLE, Comptroller, etc., Respondent.

Under the provision of the state Constitution (art. 6, § 13), prohibiting a person from holding the office of justice or judge longer than the termination of the year during which he shall arrive at the age of seventy, and declaring that "the compensation" of every justice of the Supreme Court, whose term is abridged pursuant to the provision, and who has served as such justice for ten years or more, shall be continued during the remainder of the term, a justice coming within the provision, except in the first judicial district, is entitled to receive, during the remainder of the term, not only the annual compensation of $6,000, as provided by the act of 1870 (§ 9, chap. 408, Laws 1870), but also the $1,200 allowed, in lieu of expenses, by the act of 1872 (§ 1, chap. 541, Laws of 1872). (ANDREWS, J., dissenting.)

The word "compensation," as used in said provision of the Constitution, means the sum of money the judicial officer was in receipt of from the state when his term of office was abridged. (ANDREWS, J., dissenting.)

The act of 1872 substituted an annual grant of money in place of an allowance for expenses. This was a grant of pay or compensation, having no connection with the expenses incurred, and became a part of the compensation as though the salary, *eo nomine*, had been increased. (ANDREWS, J., dissenting.)

A statute appropriating sums of money for the support of government cannot furnish any evidence of the intention with which some previous

act was passed, which fixed the amount or mode of payment of an official's compensation.

Where it is claimed that an act furnishes some evidence as to the legislative intent in some previous enactment, the court should be able to clearly infer that in passing the act the legislative body had in mind the previous act, and the particular object aimed at in enacting it.

*People ex rel. Bockes* v. *Wemple* (52 Hun, 414) reversed.

(Argued June 19, 1889; decided October 8, 1889.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department, made May 9, 1889, which affirmed an order of Special Term denying a motion for a *mandamus*.

The nature of the relief sought in the proceeding and the material facts are sufficiently stated in the opinion.

*Esek Cowen* for appellant.· The provisions of the law of 1870 as to the $5 *per diem* for expenses was abrogated by a law passed in 1872. (Laws of 1870, chap. 408, § 9; Laws of 1872, chap. 541, p. 1234, § 1.) The compensation, for the continuance of which provision was made by the amendment to section 13 of article 6 of the Constitution, was clearly that given by the statutes which were in force when that amendment was adopted, namely, an annual compensation of $7,200. (*People* v. *Edmonds,* 15 Barb. 529, 535.)

*Z. S. Westbrook* for respondent. The written law must be construed by ascertaining and giving effect to the intention of the makers and framers. The intention of the legislature must be discovered from different signs and collected from the words used, and it must be such an intention as the legislature have used words to express and what they really meant in their enactment. (Potter's Dwarris on Stat. 181–182; *Brewer* v. *Blongher,* 14 Pet. 178.) The statutes should be read according to the most natural and obvious import of the language employed, without resorting to subtle and false construction for the purpose of either limiting or extending their provisions. (Potter's Dwarris on Stat. 184: *Pearsall* v. *Elmer,* 5 Redf. 181; *Jerome Park* v. *Board of Police,* 11 Abb. N. C. 342; Plowden, 10, 57, 215, 363; *People* v. *Asten,* 49 How. Pr. 417; 62 N. Y. 623; *Smith* v. *People,* 47 id. 336,

337; *Smith* v. *Lacombe*, 99 id. 43, 49 ; Potter's Dwarris on
Stat. 121–146.)   An interpretation should be adopted so as to
give effect to all the words employed, if such interpretation
be reasonable and be neither repugnant to the provisions nor
inconsistent to the object of the statute.   (*U. S.* v. *Bassett*,
2 Story, 389.)   When a part must be construed by reference
to others and to collect the legislature's intention, the whole
must be inspected and considered together, and recourse may
be had for this purpose to a proviso which has been repeated
by a subsequent act.  (Stafford Justices, Brock. 162.)  The
whole spirit, as well as the letter, must be respected, and when
the whole context demonstrates a particular intent of the legis-
lature to effect a certain object, some degree of implication
may be called in to aid that intent.  (*Dorousseau* v. *U. S.*,
6 Cranch., 314, 323.)   It is always to be presumed that the
legislature have intended the most reasonable and beneficial
construction of their acts if the words of the act are not
precise and clear.  (*Pearce* v. *Atwood*, 13 Mass. 343.) . Where
any particular construction would lead to an unjust or absurd
consequence, it would be presumed that some exception and
qualification was intended by the legislature to effect such
conclusion.  (*Commonwealth* v. *Kimball*, 24 Pick. 370 ;
*People* v. *Davenport*, 91 N. Y. 574–589 ; *L. S. & M. S. R.
Co.* v. *Roach*, 80 id. 339, 344; *Delafield* v. *Brady*, 108 id.
529.)   A thing which is within the intention of the law
makers is as much within the statute as if it were within the
letter ; and a thing which is within the letter is not within the
statute unless it be within the intention of the makers.
(*Holmes* v. *Carby*, 31 N. Y. 290; *Chase* v. *N. Y. C. R. R.
Co.*, 26 N. Y. 523 ; *Trustees* v. *Roome*, 93 id. 313, 330;
*People ex rel.* v. *Comrs.*, 95 id. 554, 558, 559.)   All the pro-
visions to that end should be taken into consideration, and no
interpretation should be given confined to a part of a particu-
lar section.  (*Newell* v. *People*, 7 N. Y. 97–100.)   Comparison
of one law with other laws made by the same legislature, or
upon the same subject or related to the same matter, and joined
for the same reason and attended with a like advantage, may

be taken and considered in arriving at a proper construction of the statute. (*People* v. *Asten,* 49 How. Pr. 417; 62 N. Y. 623; *P. W. & W. T. Co.* v. *People,* 9 Barb. 161; Potter's Dwarris on Stat. 189; *Patterson* v. *Winn,* 11 Wheat. 385; *U. S.* v. *Herves,* Crabbe, 307; *Smith* v. *People,* 47 N. Y. 330; *Du Bois* v. *McLean,* 4 McLean, 489; *Alexander* v. *Mayor, etc.,* 5 Cranch, 1, 7, 8; *People ex rel.* v. *Lacombe,* 99 N. Y. 43, 53; *Sussex* v. *Peerage,* 11 C. & F. 86; *Newell* v. *People,* 3 Seld. 97; *McClusky* v. *Cromwell,* 1 Kern. 593.) The same rules apply to the construction of a constitution as to that of a statute. (*People ex rel. Jackson* v. *Potter,* 47 N. Y. 375–379.)

GRAY, J. The relator held the office of justice of the Supreme Court of this state, from January 1, 1860, continuously, until January 1, 1888, by virtue of three elections. His last election to the office was for the term of fourteen years, commencing January 1, 1876. That term was abridged by two years by the relator attaining the age of seventy in 1887. During the last years of his incumbency of the office he was paid the sum of $7,200 per annum, in quarter-yearly payments; but since its termination the state authorities have declined to pay him otherwise than at the rate of $6,000 per annum.

The relator has sought through these proceeding to establish his right to the receipt of that full measure of compensation, of which he was in receipt while in office. The determination of the issue lies in the proper construction to be given to those laws of the state, which provide as to the compensation of Supreme Court justices, and to that portion of the Constitution of the state, which continues their compensation to them upon the abridgment of their term of office by limitation of age. Chapter 408 of the Laws of 1870, in its ninth section, provides as follows, viz.:

"The justices of the Supreme Court shall receive an annual compensation of $6,000 each, payable quarterly, in lieu of all other compensation, except that they shall receive, in addition to such stated salary, a *per diem* allowance of five dollars per day,

for their reasonable expenses, when absent from their homes and engaged in holding any General or Special Terms, Circuit Court or Court of Oyer and Terminer, or attending any convention, as hereinafter provided, to revise the rules of said court."

The legislature in 1872 (by chapter 541 of the laws of that year, § 1), in part abrogated these provisions and enacted as follows, viz. :

" The said justices of the Supreme Court, except in the first judicial district, shall receive the sum of $1,200 annually, from the 1st day of January, 1872, in lieu of, and in full of all expenses now allowed by law.

" This subdivision shall not increase the pay of any judge except the justices of the Supreme Court."

These provisions of the law being in force, with respect to the compensation of Supreme Court justices, in the year 1880, the thirteenth section of article 6 of the Constitution was amended. The section as amended, so far as is material to our consideration here, reads as follows, viz. :

" The official terms of the said justices   *   *   *   who shall be elected after the adoption of this article shall be fourteen years from and including the first day of January next after their election. But no person shall hold the office of justice or judge of any court longer than until and including the last day of December next, after he shall be seventy years of age. The compensation of every   *   *   *   justice of the Supreme Court, whose term of office shall be abridged pursuant to this provision, and who shall have served as such   *   *   *   justice ten years or more, shall be continued during the remainder of the term for which he was elected."

The one question, therefore, which is to be answered, is : What is the " compensation," which is to be " continued " to the justice, in the event mentioned in the Constitution? The comptroller argues that it must be understood to be that portion of the justice's compensation, which represented an award for services, and not that additional portion, which originated in a grant of an additional sum annually in lieu of expenses theretofore allowed by law. This argument is based,

in part, upon a reasoning upon the supposed intention of the legislature, and, in part, upon the phraseology of the yearly appropriation acts of that body, which fixed the amount to be paid for "salaries and expenses." In so far as the position of the comptroller rests upon subsequent legislative enactments, as furnishing evidence of the original legislative intention, I think it is unsound and quite untenable. I fail to understand how the legislative act of appropriating sums of money for the support of government can furnish any evidence of the intention with which some previous act was passed, which fixed the amount or mode of payment of an official's compensation. The legislature is not vested with judicial functions and, when it is claimed that the purpose of an act is obscure and that the obscurity is dispelled by referring to other acts, *in pari materia*, at least they should be demonstrative of the legislative sense. When it is claimed that an act furnishes some evidence as to the legislative intention in some previous enactment, we should be able to infer clearly that, in its passage, the legislative body had in mind the previous act and the particular object aimed at in enacting it. But, in passing acts appropriating moneys for the support of government, how can we infer any other dominant or present idea, or purpose, than the mere determination and appropriation of the amounts needed for each official channel? Can we reasonably suppose that any ideas of construction of language, or that the particular object of a previous act, the existence of which creates a demand for an appropriation of moneys, are present in the legislators' minds? I think not.

It is an elementary rule that statutes are to be interpreted according to their intent. The intention of the legislature is undoubtedly the great principle, which controls in the office of interpretation; but, as Chancellor KENT says, in his Commentaries (vol. 1, p. 462), "The words of a statute, if of common use, are to be taken in their natural, plain, obvious and ordinary signification." It is only where the literal acceptation of the words used will work a mischief, or some absurd result, or where some obscurity in the sense compels it,

that we need resort to extrinsic aids of interpretation. The intent of the legislature is to be sought, primarily, in the words used, and, if they are free from ambiguity, there is no occasion to search elsewhere for their meaning. As it was said in *McClusky* v. *Cromwell* (11 N. Y. 593), "It is not allowable to interpret what has no need of interpretation ; and when the words have a precise and definite meaning to go elsewhere in search of conjecture, in order to restrict or extend the meaning. The natural and obvious meaning should be taken without resorting to subtle and forced construction."

The rules which apply in the construction of statutes apply equally in reading a Constitution. (*Newell* v. *People*, 7 N. Y. 97.) In that case JOHNSON, J., said : " Whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing we are seeking is the thought which it expresses. * * * If the words embody a definite meaning, which involves no absurdity * * * then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. * * * It must be very plain, nay, absolutely certain, that the people did not intend what the language they have employed, in its natural signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision." The learned judge found warrant for his expressions in the language of Chief Justice MARSHALL, in *Gibbons* v. *Ogden* (9 Wheat. 188), and of BRONSON, J., in *People* v. *Purdy* (2 Hill, 31 ; 4 id. 384) ; in which cases provisions of the Constitutions of the United States and of this State, respectively, were the subjects of interpretation. The reading of textbooks and of reported decisions, however, only serves to confirm in the mind the view that where language is explicit, we should not allow ourselves to lose sight of its plain meaning, and to wander in the mazes of conjecture. Whether the excursion into the ways of speculation be invited by the natural habit of thought, or by the dictates of considerations, personal in their bearing and influence, it is dangerous to

indulge in it, when we are reading the plain and unambiguous language in which the People have framed their will.

Is there any ambiguity or doubtful meaning about the language and words of the Constitution in question? What is the reasonable doubt which a fair mind will or can entertain as to the import of the provisions that "*the compensation of every justice, whose term of office shall be abridged pursuant to this provision, and who shall have served as such justice ten years or more, shall be continued during the remainder of the term for which he was elected?*" The language is general. It says that "*the compensation*" shall be continued. It does not say compensation for services, and, in fact, it would have been impossible to convey by the use of that word any sense of restriction, or of deprivation; for the compensation was as well for services on the bench, as for what his duties and office entailed upon him off of the bench. The word *compensation* means, and, I think, obviously means, the sum of money which the judicial officer had been in receipt of from the State, when his term of office was abridged. In the law of 1870, which gave a *per diem* allowance for reasonable expenses, etc., that payment even was regarded as in the nature of compensation to the justice, for the language used was that the $6,000 a year was "in lieu of all other compensation, *except that* they shall receive, in addition to such stated salary, a *per diem* allowance," etc. The effect of the use of the word "*except*," in connection with the grant of compensation, is to invest the grant of a *per diem* allowance with the legislative idea of further compensation. Then the act of 1872 abrogates the provision for a *per diem* allowance, and grants to the justices "the sum of $1,200 annually in lieu" of expenses. This language is substitutional in its effect. It substitutes an annual grant of money to the incumbent, in the place of an allowance for expenses. This, I think, was a clear grant of pay, or compensation, having no connection with the expenses incurred by a justice. As granted by this act, it became, naturally and plainly, as much a part of the compensation to the justice as though his salary,

*eo nomine*, had been increased to compensate him further for·
what his office entailed upon him in the way of duties and
work.    Expenses or no expenses, he became entitled to the
whole of the $1,200.    In my belief, from all that we can
divine from language, and by reasoning from cause to effect,
the intention of the legislature was to make a permanent addi-
tion to the stated salary, which should be beyond the power
of subsequent legislatures to affect.    The law operated to
increase the fixed compensation of the justices, while with-
drawing any compensation measured and determined by time
occupied.    Under the old system of a *per diem* allowance of
$5, of course, the amounts received by the various justices
must have varied materially, in accordance with the necessity
for travel in the different judicial districts.    If the legislature,
therefore, had had in mind, in enacting the law of 1872, sim-
ply to make a change in the method of repaying the justices'
expenses, the amount of the grant would have been graded
accordingly.    Instead, however, the legislature increased the
salary or compensation, by adding to it a further fixed sum
in commutation of all expenses and demands.    By way of
illustrating more forcibly, we see in the annual report of the
comptroller to the legislature in 1872 (Assembly Docs., vol. I,
p. 44), that his warrants upon the state treasury on account of
the Supreme Court justices in 1871, for payment of *per diem*
allowances under the act of 1870, varied in amounts for each
judicial district, ranging from $1,370 for the fourth, to $3,030
for the seventh.    By the amendment of 1872 there was granted
to the justices in each of these districts the fixed aggregate
sum of $4,800.    This ought to show pretty conclusively that
the legislative grant had no relation to a purpose of merely
reimbursing the expenses of the justices.    The words "in lieu
of all expenses now allowed by law," in the act of 1872, indi-
cate that that allowance was superseded, and that it could no
longer be claimed in addition to the increased compensation.
The logic of the thing must lead us to suppose that the legis-
lature intended, by passing the act of 1872, to change the
whole system and, instead of paying the varying expenses of

the justices, to substitute a larger salary or compensation, to cover all services and all expenses.

The relator's position, when in office, was that of an individual employed in behalf of the government of the state, in a station of public trust, for a certain compensation. When elected in 1876 the compensation, which that employment entitled him to receive from the state treasury, was the sum of $7,200 per annum, and was paid in fixed quarter-yearly sums. He had the guaranty of the fourteenth section of article 6 of the Constitution that the compensation received by him for accepting and in holding office could not be diminished during his official term. The constitutional amendment of 1880, in prescribing the judicial term, affixed the limitation of age; but the People were as careful to respect their guaranty, as they were to be just to the public servant, whom they would retire from office regardless of his capacity and strength. I think we should hold that the People meant the full force of the words chosen to express their will. Had they intended to limit the receipt of compensation to salary as originally fixed, they could well have said so. Shall we say that they have actually said so?

I think exact justice and the gravity of the danger of importing into the constitutional words another and a more technical meaning require us to hold that the People meant to continue to the justice, retiring by the disqualification of age, whatever he had been in receipt of from the state, before his term was thus abridged. The $7,200 had become a debt of the state, which nothing could extinguish except payment, and which remained such until the official term for which he was elected had expired.

The orders of the Special and General Terms should be reversed and the writ of *mandamus* issue as prayed for by the relator.

Andrews, J. (dissenting.) I am of the opinion that the judgment below should be affirmed, for reasons which I shall briefly state. Section 13 of article 6 of the judiciary article

of the Constitution, adopted in 1869, fixed the elective term of justices of the Supreme Court at fourteen years, but provided that no person shall hold the office of judge or justice of any court longer than until and including the last day of December next after he shall be seventy years of age. The effect of this latter provision was to shorten the elective term in case of incumbents who reach the prescribed age of seventy years during their elective term, that is, before the expiration of fourteen years after the commencement of such term. Their term then ceased, and with it the emoluments of the office. In 1880 section 6 was amended by adding this clause: "The compensation of every judge of the Court of Appeals and of every justice of the Supreme Court whose term of office shall be abridged pursuant to this provision, and who shall have served as such judge or justice ten years or more, shall be continued during the remainder of the term for which he was elected." The relator was elected several times a justice of the Supreme Court, the last time in 1875, and his term under that election commenced January 1, 1876. He attained the age of seventy years in 1887, and his term ceased by limitation of age, January 1, 1888, two years prior to the expiration of his elective term. His compensation was continued during the two years by force of the constitutional amendment of 1880, and the point in controversy is as to the meaning of the term "compensation," used in that amendment; that is to say, whether it embraces simply the stated salary of a justice of the Supreme Court, of $6,000 a year, fixed by section 9, chapter 408 of the Laws of 1870, or includes also the sum of $1,200 a year, specified in chapter 541 of the Laws of 1872. The act (Chap. 408 of the Laws of 1870) is the original act which fixed the compensation of justices of the Supreme Court, elected under the constitutional amendment of 1869. The material part of the ninth section is as follows: "The justices of the Supreme Court shall receive an annual compensation of six thousand dollars each, payable quarterly, in lieu of all other compensation, except that they shall receive, in addition to such stated salaries, a *per diem* allowance of

five dollars per day for their reasonable expenses when absent from their homes and engaged in holding any General or Special Term, Circuit Court or Court of Oyer and Terminer, or in attending any convention as hereinafter provided, to revise the rules of said court.    *  *  *    But this section shall not be construed to diminish the compensation now received by the justices of the Supreme Court of the first and second judicial districts."

The general appropriation bill of 1872 contains the following provision :  " The justices of the Supreme Court, for salaries and expenses, pursuant to chapter four hundred and eight of the Laws of eighteen hundred and seventy, two hundred and thirty-seven thousand six hundred dollars.    The said justices of the Supreme Court, except in the first judicial district, shall each receive the sum of twelve hundred dollars annually, from the first day of January, eighteen hundred and seventy-two, in lieu of and in full of all expenses now allowed by law.    This subdivision shall not increase the pay of any judge, except the justices of the Supreme Court." It will be noticed that the appropriation purports to be made for salaries and expenses, pursuant to chapter 408 of the Laws of 1870.   The fourteenth section of the judiciary article of the Constitution of 1869 prescribes that the judges and justices mentioned in the prior sections " shall receive for their services a compensation to be established by law, which shall not be diminished during their official terms."

It will contribute to an easier comprehension of the question presented, viz., whether the $1,200 a year given by the appropriation act of 1872 to the justices of the Supreme Court is a part of their compensation, within the meaning of the constitutional amendment of 1880, to regard that amendment as if it had been incorporated in the original section. That section would then have abridged the elective term of judges who attained seventy years of age, before its natural expiration, but have continued their compensation during the period cut off by the limitation of age.   The question would

be precisely the same as it now is.    There could be no doubt, I think, that if chapter 408 of the Laws of 1870, had continued in force and had not been changed by the act of 1872, the relator would only be entitled to the stated salary of $6,000 a year, and that it could not be claimed that the *per diem* of five dollars a day, given to judges for reasonable expenses when absent from home on official duty, would be any part of the compensation continued for the remainder of his elective term by force of the constitutional amendment. He could, during such period, incur no expenses as judge, as he could discharge no official duties.    Some stress is laid on the word *except* in the act of 1870, following the words " in lieu of all other compensation," as indicating that the *per diem* was also treated by the legislature as compensation. The *per diem* was given as an indemnity for expenses, and the use of the word " except " may be inexact, but the statute has, I think, the same meaning as if the legislature had said, " *but* they shall receive, in addition to such stated salaries, a *per diem* allowance of five dollars per day," etc. The legislature may alter and diminish the salary of an officer during his term, unless restrained by a constitutional provision, and, I think, it would have been competent for the legislature to have repealed the *per diem* clause in the statute of 1870, and deprive a judge thereafter of any allowance for expenses, without infringing the constitutional mandate that the compensation of a judge shall not be diminished during his official term.    It was not compensation for services within the meaning of that clause.

The act of 1872 merely substituted a fixed annual allowance of $1,200 to each justice of the Supreme Court, except justices in the first district, " in lieu of and in full of all expenses now allowed by law," that is, allowed by the law of 1870, which was the only law upon the subject.    It changed the law of 1870 in two respects; the allowance was not made to depend, as in the law of 1870, upon actual employment in official duty away from the home of the officer, and it was fixed at an annual gross sum.    The legislature

1889.]          PEOPLE ex rel. BOCKES *v.* WEMPLE.          **315**

Dissenting opinion, per ANDREWS, J.

assumed that each judge would incur expenses for which he should be indemnified, and it substituted a fixed sum to be allowed to each judge therefor. It might not produce exact equality, but it relieved judges from the annoyance of keeping an account with the state of items, as was requisite under the act of 1870. But the allowance under the act of 1872, as under the prior act, was distinctly for expenses. The appropriation was for "salaries and expenses." The sum of $1,200 was given, not as salary or as compensation for services, but "in lieu of and in full of expenses" allowed under the act of 1870, that is, in lieu of the *per diem* allowed by that act for expenses, there was given for expenses the sum of $1,200 annually. It is to be observed, also, that the change made by the act of 1872 only applied to justices of the Supreme Court outside of the first district. The statute of 1870 remained in force as to the justices in that district, and their expenses are still to be ascertained and allowed under the circumstances and in the manner pointed out by the statute.

It is said that the clause in the act of 1872, "this subdivision shall not increase the *pay* of any judge, except justices of the Supreme Court," implies that the annual allowance of $1,200 was compensation. The purpose of this clause seems to have been to preclude any claim on the part of the judges of other courts in cities, who might be assigned to sit in the Supreme Court, that they were *de facto* judges of that court while so engaged and were, therefore, entitled to the allowance. Their pay was not to be increased, that is to say, they were not to be paid their expenses under the act of 1872. The exception in the first clause was confined to justices of the Supreme Court in the first district. Judges of the City Courts sitting in the Supreme Court are not justices of the Supreme Court, and the last clause was intended to make it clear that they were not to have the benefit of the act.

The argument that as a judge after seventy can render no service, and yet is entitled to his salary, there is no incongruity in allowing him to claim after that time the sum allowed him for expenses while he was on the bench, although he is in no

situation to incur them, is specious, but not, I think, sound. The compensation of a judge is continued after seventy, during the term for which he was elected, provided he had served for ten years, as an indemnity for being deprived of the opportunity to earn his salary, although in many, and probably in by far the greater number of cases, he would be fully competent to discharge his judicial duties to the end of his elected term. But because, by express constitutional provision, his compensation is continued although he can render no service, this seems to furnish but little ground for holding that an allowance made during his actual service, for disbursements and expenses, should be continued under the name of compensation, when the possibility of their being incurred has wholly ceased. The construction for which the relator contends would practically make the compensation of a judge who had retired by limitation of age greater than that of a judge in actual service, since the former would incur no expenses, while the latter would be subjected to them. I think it would be torturing language to so enlarge the natural meaning of the word " compensation," used in the Constitution, so as to make it embrace the allowance made for expenses in the act of 1872.

All concur with GRAY, J., except ANDREWS, J., who reads for affirmance, and DANFORTH, J., not voting.

Ordered accordingly.